## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

### Case No.: 3:22-cv-70

DUSTIN HEMINGER; MICHAEL ANDERSON; DUSTIN NEWELL; ANDREW ALIAS; AMANDA REMANN; ADAM HYDE; DUSTIN THORNBERRY; ROBERT DONKOR; ANTHONY WAJDA; ANNA NICKELSON; ADAM FLORES, and BRYAN WOLLENBERG; on behalf of themselves and others similarly situated,

        Plaintiffs,

vs.

THE UNITED STATES OF AMERICA;

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

_____

### VERIFIED CLASS ACTION COMPLAINT FOR PRELIMINARY, PERMANENT, INJUNCTIVE, AND DECLARATORY RELIEF

Plaintiffs, Dustin Heminger; Michael Anderson; Dustin Newell; Andrew Alias; Amanda Remann; Adam Hyde; Dustin Thornberry; Robert Donkor; Anthony Wajda; Anna Nickelson; Adam Flores, and Bryan Wollenberg, on behalf of themselves and all others similarly situated ("Plaintiffs"), file this Verified (Exhibit J) Class Action Complaint for Preliminary, Permanent, Injunctive, and Declaratory Relief against The United States of America ("United States;" "Government;" or "Employer") and allege as follows:

## NATURE OF ACTION

1.  While the Supreme Court recently emphasized how "even in a pandemic, the Constitution cannot be put away and forgotten," it has been cavalierly disregarded under the current administration. *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 68 (2021).

2.  From President Biden's oligarchic proclamations like Executive Order No.'s 14042 and 14043, to government agencies like Plaintiffs' employer, the Federal Aviation Administration ("FAA"), requiring its employees to take harmful and oftentimes deadly COVID-19 vaccines as a condition of employment, America's identify as the "Shining City on a Hill"[1] appears to have become a dark shadow of its former self; and like Paul's cry to the city of Ephesus, the United States needs to "Awake" before it is too late. The Bible, Ephesians 5:14 (King James Version).

3.  There is no pandemic exception to the United States Constitution; and it is imperative that the procedural safeguards and protections contained therein be strictly followed and *always* serve as the country's guidepost – *especially* during

---

[1] President Ronald Reagan's Farewell Address to the Nation, January 11, 1989. Available at: https://www.reaganlibrary.gov/archives/speech/farewell-address-nation (last visited January 14, 2022).

uncertain, turbulent times. As stated by Justice Hughes in *Home Building & Loan Assn. v. Blaisdell*, 290 U.S. 398, 425-426 (1934):

> Emergency does not create power. Emergency does not increase granted power or remove or diminish the restrictions imposed upon power granted or reserved. The Constitution was adopted in a period of grave emergency. Its grants of power to the federal government and its limitations of the power of the states were determined in the light of emergency, and they are not altered by emergency.

4. The Constitution enumerates those powers delegated to each branch of the federal government with all others reserved to the States (i.e., historical police powers such as health, safety, and welfare) as expressed by the Tenth Amendment. The problem here, however, are powers have been unlawfully delegated or commingled between branches of government and agencies; while States' or We the Peoples' rights have been trampled and eclipsed.

5. The Biden Administration has usurped legislative process and unilaterally imposed vaccine mandates which is exceedingly beyond the scope of permissible federal powers (legislative, executive, or otherwise). The administration has cut the States out of their central role in deciding whether to impose a vaccination mandate by administrative fiat or executive decree. The tenets of Federalism have not been respected as evidenced by the decades of legislation passed and signed

3

into law by Presidents (on both sides of the isle) which has gone unchecked by the judiciary for *at least* the past six decades; which has whittled away at Americans' God-given rights. Through neglect and ostensibly design, the conflation of authority and illicit laws continue and remain in effect; resulting in unbridled government and private employer actions that are seriously injuring and literally killing Americans daily (emphasis added).

6. Plaintiffs are in the Air Traffic Organization ("ATO") within the Federal Aviation Administration ("FAA") who have been given an unconscionable ultimatum by their own government and employer which among other things, grossly violates *numerous* provisions of the Constitution and natural laws of men: choose between their jobs which afford them the ability to feed, clothe, and house their families – or – take an experimental, life-threatening vaccine.

7. Plaintiffs Constitutional and human rights should not be levied against them or contingent upon taking a deadly inoculation under Emergency Use Authorization ("EUA"); especially when the manufactures like Pfizer have been afforded practically carte blanche immunity from civil liability (emphasis added). Plaintiffs maintain that anyone who wants to get vaccinated and/or booster shots should be permitted to do so; however, nobody should be coerced, induced, or

threatened into taking a medical procedure they do not want. Likewise, all persons should be fully informed of all the risks and benefits of a procedure (known and unknown) before making a decision.

8.   This action for declaratory and injunctive relief challenges government and employer-mandated vaccines; as well as, those laws, rules, and regulations that afford pharmaceutical companies like Pfizer robust, broad-based immunity for the harms their products cause like the COVID-19 vaccines as violative of Constitutional and human rights; as well as, federal law.

## PARTIES

**Plaintiffs – Federal Employees**

9.   Plaintiffs are employees working at the Air Traffic Organization ("ATO") within the FAA that provides air navigation service within the National Airspace System. The ATO serves as the operations arm of the FAA and employs more than 35,000 controllers, technicians, engineers, and support workers. Plaintiffs have and continue to be subjected to COVID-19 vaccine mandates via President Biden's September 09, 2021, Executive Orders, and/or the FAA requiring its employees and contractors be vaccinated as a condition of employment.

10. Plaintiffs have not been inoculated with a COVID-19 vaccine and do not want to be (or have taken the vaccine against their will); had the SARS-CoV-2 virus

and/or COVID-19 disease and recovered; have natural immunity or antibodies; and/or sincere, religious beliefs which forbid Plaintiffs from taking a COVID-19 vaccine. Plaintiffs do not want their employment to be conditioned upon taking a COVID-19 vaccination or an Emergency Use Authorization ("EUA") medical product; nor have their employer ask about the status of same.

**Defendant – The United States of America ("United States" or "Government")**

11. Defendant is the United States of America who is responsible for the passing, issuance, and/or implementation of the challenged actions referenced. This includes officials like President Biden ("Biden"), Pete Buttigieg ("Buttigieg"), and Steve Dickson ("Dickson"); as well as, the Government's departments and agencies like the United States Department of Transportation ("DOT") and the Federal Aviation Administration ("FAA").

**Defendant – Vaccine Manufacturer**

12. Defendant Pfizer, Inc. ("Pfizer") is one of the COVID-19 vaccine manufacturers; specifically, the BNT162b2/Comirnaty vaccine.

## JURISDICTION & VENUE

13.  This Court has jurisdiction under 28 U.S.C. §1331 as the issues arise under the laws and Constitution of the United States; as well as, 28 U.S.C. §1343 civil rights jurisdiction emanating from the deprivation of Plaintiffs' rights, privileges, and immunities under the Constitution and laws of the United States; 28 U.S.C. §1346 as the United States is a Defendant; 5 U.S.C. §§ 702–703, et. seq.; 28 U.S.C. §§1361, 2201–02; the Constitution, and the Court's equitable powers.

14. Venue is proper under 28 U.S.C. §1391 as many Plaintiffs reside in this district; substantial parts of the acts or omissions giving rise to the need for a declaratory judgment action occurred in this district; and Plaintiffs have been affected by agency action under 5 U.S. Code § 702-706.

## STATEMENT OF FACTS

### I.    GENERAL INFORMATION & OVERVIEW

15. By mid-March 2020, the "novel coronavirus", SARS-CoV-2, which can cause the disease, COVID-19, had spread worldwide and wreaked havoc on the United States' healthcare, economy, and well-being. While SARS-CoV-2 was called 'novel,' it was not some unrecognizable virus – just a new strain of coronavirus that resides in both humans and animals. SARS-CoV-2 behaves like SARS-CoV that emerged in China in 2002 which justifies why it was classified and

7

named as such. SARS-CoV-2 has the same genetic structure, uses the same host cell receptor to begin the infection cycle, and causes the same disease as SARS-CoV in humans. *See* affidavit of Dr. Jennifer Smith at **Ex. C**.

16.  Alarmingly, the most novel aspects of SARS-CoV-2 and COVID-19 disease were the federal and state governments' responses. Due to the growing number of COVID-19 cases, former U.S. Health and Human Services ("HHS") Secretary, Alex M. Azar, II ("Azar"), determined that a public health emergency existed and a national emergency was declared. Among others, The Public Readiness and Emergency Preparedness Act (PREP) was invoked and the Coronavirus Aid, Relief, and Economic Security Act ("CARES"), H.R. 748, was introduced to Congress and signed into law shortly thereafter.

17.  Pursuant to Section 546 of the Food, Drugs and Cosmetics Act (or "FDCA"), Azar utilized 21 U.S.C. §360bbb-3, declared that the SARS-CoV-2 virus created a "public health emergency" that had significant potential to affect national security or trigger an "Emergency Declaration." Based on the Declaration, Operation Warp Speed was set in motion permitting COVID-19 vaccines to be developed for Emergency Use Authorization ("EUA") faster than any other vaccine in the

Nation's history – with never-before-seen uninhibited, lack-of accountability, and disregard for process, safety, and regulation.

18.  Plaintiffs are Air Traffic Controllers presently being subjected to the FAA's unlawful and dangerous COVID-19 vaccine mandates.

19. The mandate's origins arise out of President Biden's September 09, 2021, Executive Orders No. 14042 and 14043 requiring COVID-19 inoculation of all federal employees and contractors ("Executive Orders"). The Occupational Safety and Health Administration ("OSHA") agency was tasked responsible for its enforcement; however, on January 13, 2022, the U.S. Supreme Court held in part:

> The Secretary of Labor, acting through the Occupational Safety and Health Administration, recently enacted a vaccine mandate for much of the Nation's work force. The mandate, which employers must enforce, applies to roughly 84 million workers, covering virtually all employers with at least 100 employees. It requires that covered workers receive a COVID–19 vaccine, and it pre-empts contrary state laws. The only exception is for workers who obtain a medical test each week at their own expense and on their own time, and also wear a mask each workday. OSHA has never before imposed such a mandate. Nor has Congress. Indeed, although Congress has enacted significant legislation addressing the COVID–19 pandemic, it has declined to enact any measure similar to what OSHA has promulgated here. Many States, businesses, and nonprofit organizations challenged OSHA's rule in Courts of Appeals across the country. The Fifth Circuit initially entered a stay. But when the cases were consolidated before the Sixth

> Circuit, that court lifted the stay and allowed OSHA's rule to take effect. Applicants now seek emergency relief from this Court, arguing that OSHA's mandate exceeds its statutory authority and is otherwise unlawful. Agreeing that applicants are likely to prevail, we grant their applications and stay the rule.

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, No. 21A244, 2022 WL 120952, at *1 (U.S. Jan. 13, 2022).

20. While the Supreme Court has held that OSHA as the enforcement arm is unlikely to be successful, the executive orders and employer mandates remain.

21. Plaintiffs have been given an unconscionable ultimatum which violates numerous provisions of the U.S. Constitution; as well as, federal and international laws: choose between their jobs which afford them the ability to feed, clothe, and house their families – or – take an experimental, life-threatening vaccine.

22. The statistics regarding the COVID-19 vaccines are shocking. For the Court's consideration, five (5) highly qualified experts or doctors have provided affidavits or sworn statements stating in their opinions, the COVID-19 vaccines which the government and employers are forcing upon the American workforce (Plaintiffs included) can cause significant harm or death. *See* affidavits/statements attached of Dr. Jennifer Smith (**Ex. C**), Dr. Jane Ruby (**Ex. D**), Dr. Ben Edwards (**Ex. E**), Dr. Peter McCullough (**Ex. F**), and Lieutenant Colonel Theresa Long (**Ex. G**).

23. Coincidingly, the January 07, 2022, OpenVaers.com data shows 1,033,992 Reports of adverse reactions and issues, which among other things, includes: 21,745 deaths, 11,754 hospitalizations, 112,235 requiring urgent care, 3,594 miscarriages, 11,055 heart attacks, and leaving 37,937 people permanently disabled. *See* https://openvaers.com/covid-data (and graphic below). This is particularly concerning as the total safety reports in VAERS for all vaccines up to 2019 was 16,320. By comparison, from 1999, until December 31, 2019, VAERS received 3167 death reports (158 per year) for all vaccines combined. And a 2011 report by Harvard Pilgrim Healthcare for DHHS[2] showed that fewer than 1% of all vaccine adverse events are reported to VAERS, suggesting the actual number of COVID-19 vaccine-related injuries is significantly higher.



---

[2] Harvard Pilgrim Health Care, Inc. Electronic System for Public Health Vaccine Adverse Events Reporting System *AHRQ* 2011 https://www.nvic.org/CMSTemplates/NVIC/Pdf/FDA/ahrq-vaers-report-2011.pdf

24. This is supported by the World Health Organization's reporting of **over two million nine-hundred and sixty thousand** (2,961,255), adverse reactions to the vaccines have been reported to the WHO[3] including:

Blood and lymphatic system disorders (127397); Cardiac disorders (170756); Congenital, familial and genetic disorders (1843); Ear and labyrinth disorders (96812); Endocrine disorders (5158); Eye disorders (108473); Gastrointestinal disorders (577561); General disorders and administration site conditions (1760957); Hepatobiliary disorders (6425); Immune system disorders (48112); Infections and infestations (246728); Injury, poisoning and procedural complications (169832); Investigations (425507); Metabolism and nutrition disorders (64251); Musculoskeletal and connective tissue disorders (819934); Neoplasms benign, malignant and unspecified (incl cysts and polyps) (5363); Nervous system disorders (1229284); Pregnancy, puerperium and perinatal conditions (7683); Product issues (4420); Psychiatric disorders (138417); Renal and urinary disorders (25124); Reproductive system and breast disorders (146941); Respiratory, thoracic and mediastinal disorders (317029); Skin and subcutaneous tissue disorders (393138); Social circumstances (21665); Surgical and medical procedures (45958); Vascular disorders (156191).

25. Additionally, a healthcare data analyst with access to Medicare/Medicaid data provided sworn testimony in a July 19, 2021, lawsuit[4] that the number of deaths occurring within just 3 days of injection with the COVID vaccines is *at least* 45,000. There is no reasonable alternate cause for these deaths – these vaccines are

---

[3] http://www.vigiaccess.org/ (searching covid-19 vaccine)
[4] *America's Frontline Doctors et al. Plaintiffs vs Xavier Becerra*, Secretary of the U.S. Department of Health and Human Services. Civil Action No. 2:21-cv-00702-CLM. In the United States District Court for the Northern District of Alabama. Plaintiffs Motion for Preliminary Injunction. Filed 07/19/2021.

killing Americans. This data is compulsory and verified; ergo, more accurate than VAERS or the World Health Organization's (vigiaccess.org).

26. Notably, emerging data from Israel, one of the most heavily vaccinated countries in the world, illustrates that hospitalizations and deaths are primarily of the vaccinated. Dr. Kobi Haviv, Israel's center for respiratory care director, reported on August 07, 2021, that 85-90% of hospitalizations are vaccinated individuals and that 95% of severe cases are vaccinated individuals[5]. This data indicates that vaccinated people are 4-times more likely to get Covid, get very sick, or even die than the unvaccinated.

27. Furthermore, as reflected below, the vaccines do not work as purported:

## THE SCALE OF THE COVID-19 INJECTION
# EFFICACY LIE

| Jab Type | What they told you it did THE MARKETING LIE Relative Risk Reduction | What it actually does THE LANCET STUDY Absolute Risk Reduction from Jab |
|---|---|---|
| Pfizer/BioNtech | 95.03% | 0.84% |
| Moderna (NIH) | 94.08% | 1.24% |
| Janssen | 66.62% | 1.19% |
| AstraZeneca/Oxford | 66.84% | 1.28% |

Source: **www.thelancet.com/journals/lanmic/article/PIIS2666-5247(21)00069-0/fulltext**
For more information please visit: **doctors4covidethics.org**

---

[5] https://13news.co.il/?utm_source=Reshet&utm_medium=bar_nivut_elyon_new13

28. Meanwhile, the government or the Centers for Disease Control and Prevention ("CDC") espouses or promotes the following information[6]:

## What You Need to Know

- Everyone ages 5 and older can get vaccinated against COVID-19. Learn how to find a COVID-19 vaccine.
- COVID-19 vaccines are effective at helping protect against severe disease and death from the virus that causes COVID-19, including known variants currently circulating (e.g., Delta variant).
- The benefits of COVID-19 vaccination outweigh the known and potential risks, which are rare.
- As with other routine vaccines, side effects may occur after vaccination. These are normal and should go away within a few days.
- People who are fully vaccinated can resume many activities they did before the pandemic. However, people should wear a mask indoors in public if they are in an area of substantial or high transmission.
- If you received a Pfizer-BioNTech (ages 12 and older) or Moderna (ages 18 and older) mRNA COVID-19 vaccine primary series and have a moderately or severely compromised immune system, you should receive an additional primary dose of the same mRNA COVID-19 vaccine at least 28 days after the second dose.
- Everyone ages 16 years and older can get a booster shot. Pfizer-BioNTech or Moderna (mRNA COVID-19 vaccines) are preferred in most situations. Although mRNA vaccines are preferred, J&J/Janssen COVID-19 vaccine may be considered in some situations.
- Unlike many medications, COVID-19 vaccine dosage does not vary by patient weight but by age on the day of vaccination.
- People can get a COVID-19 vaccine and other vaccines, including flu vaccine, at the same time.

---

[6] https://www.cdc.gov/coronavirus/2019-ncov/vaccines/keythingstoknow.html#:~:text=People%20can%20get%20a%20COVID,at %20the%20same%20time. (last accessed January 15, 2022).

29.  Plaintiffs have real, substantial, and legitimate concerns about taking one of the COVID-19 vaccines in light of the known injuries and deaths; as well as, those harms and dangers which are unknown. Coincidingly, Plaintiffs do not want to be treated differently in the workplace based on their vaccination status or asked about same; and maintain it is unlawful for the employer to do so.

30. Similarly, Plaintiffs do not want to take PCR tests which are inaccurate and whose EUA has been revoked; or have to wear their vaccination status on their face with masks which cannot thwart or block the transmission of the SARS-CoV-2 virus or COVID-19 disease as noted in a National Center for Biotechnology Information, U.S. National Library of Medicine study: "while surgical masks provide a barrier against large respiratory particles, they are ineffective at providing protection from smaller particles. Surgical masks also do not prevent leakage around the mask when the user inhales. Therefore, surgical masks are ineffective and do not provide enough protection when performing direct care for patients with COVID.[7]"

31.  The effectiveness of masks in stopping the spread of SARS-COV-2 and/or COVID-19 is not supported by sound, scientific data; and studies have shown that

_____

[7] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7831687/

wearing a mask for extended periods of time can actually be injurious to overall

health. As such, masks would not be a reasonable alternative and would not serve

a compelling interest of preserving public health because they cannot prevent

infection or transmission of SARS-COV-2 or COVID-19. In fact, over a decade's

worth of scientific studies regarding masks' use and their efficacy concluded they

do not prevent the spread of viruses like the flu:

- In 2009, the American Journal of Infection Control concluded "face mask use in health care workers was not demonstrated to provide benefit in terms of cold symptoms or getting colds." https://pubmed.ncbi.nlm.nih.gov/19216002/

- A year later, a study in Epidemiology and Infection entitled "Face masks to prevent transmission of influenza virus: A systematic review" found that "none of the studies reviewed showed a benefit from wearing a mask, in either health care workers or community members in households." https://www.cambridge.org/core/journals/epidemiology-and-infection/article/face-masks-to-prevent-transmission-of-influenza-virus-a-systematic-%20review/64D368496EBDE0AFCC6639CCC9D8BC05

- In 2012, researchers published a study called "The use of masks and respirators to prevent transmission of influenza: a systematic review of the scientific evidence" and found "There were 17 eligible studies. … None of the studies established a conclusive relationship between mask/respirator use and protection against influenza infection." https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5779801/

- In 2016, a study in the Canadian Medical Association Journal "found no significant difference between N95 respirators and surgical masks in associated risk of (a) laboratory-confirmed respiratory infection, (b) influenza-like illness, or (c) reported work-place absenteeism." https://www.cmaj.ca/content/188/8/567

- A 2019 study in the Journal of the American Medical Association determined that "among outpatient health care personnel, N95 respirators vs medical masks as worn by participants in this trial resulted in no significant difference in the incidence of laboratory-confirmed influenza." https://jamanetwork.com/journals/jama/fullarticle/2749214

- And even a study published in the Journal of Evidence-Based Medicine on February 12, 2020, a month before America's COVID panic set in, concluded that "there were no statistically significant differences in preventing laboratory-confirmed influenza, laboratory-confirmed respiratory viral infections, laboratory-confirmed respiratory infection, and influenza-like illness using N95 respirators and surgical masks." https://onlinelibrary.wiley.com/doi/epdf/10.1111/jebm.12381

## II.   FDA APPROVAL

32. The FDA issued EUAs for Pfizer, Moderna, and J&J – the PfizerBioNTech Covid Vaccine on December 11, 2020[8], a week later the Moderna Vaccine[9], and most recently, the Johnson & Johnson Vaccine[10] ("vaccines").

---

[8] Pfizer-BioNtech Vaccine FAQ, FDA, bit.ly/3i4Yb4e (last visited August 27, 2021).
[9] Moderna, About Our Vaccine, bit.ly/2Vl4lUF (last visited August 27, 2021).
[10] EUA for Third COVID-19 Vaccine, FDA, bit.ly/3xc4ebk (last visited August 27, 2021).

33. Numerous memoranda and petitions, however, have been sent to the Government and private corporations concerning the approval/regulations of the COVID-19 vaccines and those laws and rules that have been usurped surrounding the COVID-19 vaccines. *See e.g.* December 15, 2021, addressed to entities including Defendant as **Exhibit A**.

34. Doctors from around the world, as well as, scientists, virologists, epidemiologists, and vaccine researchers have flooded the scientific community with data and studies exposing the dangers of these vaccines, their ineffectiveness, the unnecessary nature of them, and suitable, effective, alternative treatments for treating the SARS-CoV-2 virus and COVID-19 disease. This data alone should have prohibited the issuance and subsequent re-issuances of the EUA and/or Comirnaty's "full approval;" yet remarkably, the vaccines were not only authorized and renewed but the boosters that followed as well.

A. FDA Guidance on Testing and Review of COVID-19 Vaccines

35. In June 2020, HHS, FDA, and the Center for Biologics Evaluation and Research ("CBER") issued guidance to vaccine developers on clinical and non-clinical testing and the procedures the FDA intended to apply in evaluating and

18

approving COVID-19 vaccines[11]. The state-managed FDA did not follow standard procedures or industry recommendations. The June 2020 Industry Guidance included a number of recommendations that ultimately were not followed; in particular: (1) the inclusion in clinical trials of individuals with previous Covid infections; (2) the inclusion of pregnant women; and (3) the use of clinical trials lasting "*at least one to two years*."

36. Notably, many of Plaintiffs contentions and concerns above are shared by others as evidenced by the Citizen Petition submitted by the Coalition Advocating for Adequately Licensed Medicines on July 23, 2021 in Docket No. FDA-2021-P-0786. ("Citizen Petition"). *See also Exhibit A*. The FDA *denied* the Citizen Petition on August 23, 2021; which coincidently was the same day the FDA approved Comirnaty. See Comirnaty approval letter attached as **Exhibit B** (BLA).

B.  Citizen Petition & FDA Response

37. On August 23, 2021, the FDA approved the May 18, 2021, Comirnaty application for individuals 16 years or older; and re-issued the EUA for the BioNTech Vaccine for individuals 16 years or older and for children aged 12 to 15

---

[11] *See* HHS, FDA & CBER, Development and Licensure of Vaccines to Prevent COVID-19: Guidance for Industry (June 2020) ("June 2020 Industry Guidance"), available at: https://www.fda.gov/media/139638/download (last visited October 11, 2021).

years, and expanded the EUA to cover a third "booster" shot for certain groups. The FDA Comirnaty Approval and BioNTech EUA Expansion thus licensed a vaccine and continued an existing EUA for the same group (individuals 16 years or older). In other words, the FDA has incorrectly asserted that the EUA BioNTech Vaccine and the conditionally approved Comirnaty Vaccine can be used "interchangeably." As explained above, this statement is contradictory and incorrect insofar as it suggests that an EUA Vaccine, manufactured and labeled in accordance with the EUA, may be treated as a licensed product. Conversely, it submits that the Comirnaty Vaccine can be used for "off-label" uses under the EUA, e.g., for a child under 16 or for a third "booster" dose for which there is no clinical trial data available.

38.  The FDA appears to acknowledge that the EUA BioNTech Vaccine and the conditionally licensed Comirnaty are not in fact "interchangeable." The Comirnaty Approval Letter approves the sale of Comirnaty Vaccine, as well as, the specific manufacturing facilities, processes, ingredients, storage, and distribution requirements that were not addressed in the EUA.

39. For example, the Comirnaty Approval Letter requires FDA approval for release of Comirnaty lots manufactured in accordance with the terms of the

license. Given the differences in manufacturing between EUA and licensed vaccines, the FDA also required BioNTech to identify specific lots of EUA-labeled and manufactured BioNTech Vaccines that BioNTech deemed BLA-compliant for FDA review and release. The identification, however, of these specific lots for FDA review did not occur.

40. The Comirnaty Vaccine is not widely available due to limited supply as supported by various reports[12]; buttressing the conclusion that an employer-mandated vaccine is using an EUA inoculation (BioNTech Vaccine) and not the licensed Comirnaty Vaccine.

C.   <u>Procedural and Substantive Deficiencies in FDA Review and Approval</u>

41. The FDA claims that the Comirnaty Vaccine approval followed its "standard process for reviewing the quality, safety, and effectiveness of medical products,[13]" but this statement is belied by its contemporaneous statements and the deficient process it followed by their own admission.

---

[12] https://www.oecd.org/coronavirus/policy-responses/access-to-covid-19-vaccines-global-approaches-in-a-global-crisis-c6a18370/ (last accessed October 16, 2021).
[13] FDA, *FDA Approves First COVID-19 Vaccine*, (Aug. 23, 2021) ("FDA Comirnaty Press Release"), available at https://www.fda.gov/news-events/press- announcements/fda-approves-first-covid-19-vaccine (last visited Sept. 22, 2021).

42. In its August 23, 2021, press conference, it was conceded that the FDA followed an "unprecedented timeline" in approving Comirnaty's application in just over three months; and did so by skipping, or failing to require the procedures and clinical trial data needed to assess Comirnaty's safety and efficacy as required by statute and law (emphasis added).[14] This confession alone raises questions regarding the scrutiny and safety of these vaccines; and the process (or lack thereof) followed.

  a. *FDA Permitted Exclusion of "Special Populations."*

43. Neither the BioNTech Vaccine nor the Comirnaty Vaccine has been tested in clinical trials for its safety and efficacy on individuals who have recovered from COVID-19. To the contrary, the trials conducted thus far have specifically *excluded* survivors of previous Covid infections[15]. Plaintiffs contend the exclusion was an intentional act allowed by the FDA because such studies would show the futility of the vaccines.  Such studies would reveal how natural immunity is stronger and longer lasting, and would render the vaccines unnecessary. Stated differently: the

---

[14] Justine Coleman, FDA Grants Full Approval to Pfizer's COVID-19 Vaccine, The Hill (Aug. 23, 2021) (quoting Defendant FDA Commissioner Woodcock), available at: https://thehill.com/policy/healthcare/568980-fda-grants-full-approval-to-pfizers-covid-19-vaccine (last visited Sept. 22, 2021).

[15] *See* Fabio Angeli, SARS-CoV-2 vaccines: Lights and Shadows, EUROPEAN J. OF INTERNAL MEDICINE 2021;88:1-8.

FDA did not want to include studies of those naturally immune because it would end the symbiotic relationship and fraudulent, unlawful racketeering going on between the Government, vaccine companies like Pfizer, and the private sector.

44. In a similar vein, the clinical trials skipped testing for genotoxicity, mutagenicity, teratogenicity, and oncogenicity testing; and did not include participants from and/or provide sufficient data for other "special populations" such as those with autoimmune disorders, hematological conditions, children, and the elderly. Plaintiffs contend these were also intentionally excluded because the results of the study would have revealed how the vaccines cause injury or death among these persons. Stated differently, it appears that the FDA wanted a vaccine with which universal inoculation could be achieved.  The FDA broke its own rules, procedures and statues in order to get this vaccine "approved," but it did not want to allow the revelation of the terrible side effects and the death the vaccine caused. It is not unreasonable to conclude that the FDA intentionally conspired with other agencies, drug manufacturers, and private employers to affect these harms and deaths upon plaintiffs and Americans at large.  Instead, the FDA relied solely on rat studies for its approval of Comirnaty for these populations.

b. *The FDA Relied on Interim Results for Limited and Self- Selected Sample*

45.  While the Phase 3 clinical trials included a large and statistically significant number of participants, the full sample trial was truncated in unprecedented fashion. It was only followed for only ***two months.*** Largely, the same trials and participants that were used to grant the initial EUA for the BioNTech Vaccine. The trial was approved regardless of the FDA's recommended period ***of at least one to two years*** as set forth in the June 2020 Industry Guidance referenced above.

46. These truncated trials produced unreliable data. The FDA does not acknowledge, however, that the results of the trials beyond the first two months are of questionable (or perhaps negligible) validity due to fundamental methodological errors that infected all trial results and undermine any conclusions that could have been drawn from them. As the axiom goes, "bad data in, bad data out" – which proved to be the case here and appears it was intentional.

47. Pfizer failed to maintain test group integrity as required by FDA procedures and statutes.  In its May 18, 2021 application[16], which included interim six-month safety and efficacy data for Phase 3 clinical trials, Pfizer- BioNTech

---

[16] *See* Stephen J. Thomas, MD, Six Month Safety and Efficacy of the BNT162b2 mRNA COVID-19 Vaccine, medRxiv Preprint (July 28, 2021), available at: https://www.medrxiv.org/content/10.1101/2021.07.28.21261159v1.full.pdf.

explained that study participants were given the option to be "unblinded" – to learn whether they had taken the experimental BioNTech Vaccine or the placebo – and if they had taken the placebo, to take the BioNTech Vaccine. As a result, roughly 7% of participants were still unaware of which shot they were given after six months.  This "unblinding" transcended what should have been a randomized, controlled clinical trial into an observational, "let's just see what happens" with no informed consent as required by Federal and International law.  Accordingly, the FDA's statements that the Comirnaty approval was based on "randomized, controlled, blinded ongoing clinical trial of thousands of individuals," is misleading at best. With stakes so high, there is no room for ambiguity.

   c.  *The FDA's Abdications of their Duties and Ongoing Failure to Act is Intentional*

48.  Despite having been thousands of deaths and serious injuries self-reported through VAERS and the Medicare system that is run by the Government, and over two million nine-hundred thousand (2,900,000) adverse reactions to the vaccines reported to the WHO[17], the FDA has willfully, or with reckless disregard, ignored or chose to not follow its own industry guidance and historical, standards of practice which Plaintiffs opine can seemingly only be for nefarious purposes. The

---

[17] http://www.vigiaccess.org/ (searching covid-19 vaccine)

Government, through Plaintiffs' employer, used and abused the unlawful licensing or "approval" of Comirnaty to sanction vaccine mandates and invariably the PCR test and masks policies to further their objective of universal inoculation.

49. Notably, for an EUA approval, there must be no alternative, effective treatments available for use against the disease. There are now well-studied, safe and reliable alternatives to vaccination for prevention and treatment of COVID-19, including, but not limited to Ivermectin, Methylprednisolone, Fluvoxamine, Hydroxychloroquine, Vitamin C, Vitamin D3, Zinc, Melatonin, Aspirin, corticosteroids, monoclonal antibodies, and other accessible therapies. *See e.g.* affidavits by Dr. Edwards (Ex. E) and Dr. McCullough (Ex. F).

50. This information above has been shunned, suppressed, or censored by the Government, vaccine manufacturers, and private sector – especially big media and big tech. For instance, the use of Ivermectin was rejected by the FDA despite having significantly more peer reviewed studies (forty-four (44); and thirty-two (32) double-blind clinical trials showing substantially higher efficacy than FDA promoted treatments like Pfizer's Remdesivir. Ivermectin was commonly described as an anti-parasitic drug for horses rather that the truth about its efficacy as an anti-viral prophylaxis. Remdesivir on the other hand, was discontinued amid

its trials after many deaths, but was approved by the FDA as treatment for Covid notwithstanding its direct link to kidney failure; and which causes or develops into pneumonia and/or death.

51. Since the PCR tests, masks, and vaccines were authorized under EUAs, the administration of these medical products are subject to informed consent requirements to "ensure that individuals to whom the product is administered are informed" that they have "the option to accept or refuse administration of the product." FDCA § 564(e)(1)(A)(ii)(III); 21 U.S.C. § 360bbb-3(e)(1)(A)(ii)(III).[18] The vaccines for example, in each letter granting the EUA by requiring that FDA's "Fact Sheet for Recipients and Caregivers" be made available to every potential vaccine recipient. Each Fact Sheet includes the statement that it is your choice to receive or not receive the vaccine; however, Plaintiffs are not provided a choice.

## III.   COVID-19 HEALTH RISKS AND NATURAL IMMUNITY

52. The mortality risk for those infected with the SARS-COV-2 virus which can cause the COVID-19 disease is not the same for everyone. Older patients and those

---

[18] The norms of informed consent has been "firmly embedded" in U.S. law and FDA regulations for nearly 60 years. *Adullahi v. Pfizer, Inc.*, 562 F.3d 163, 182 (2nd Cir. 2009). Congress first enacted this requirement in 1962 drawing on the Nuremberg Code and the Helsinki Declaration, "which suggests the government conceived of these sources' articulation of the norm as a binding legal obligation." *Adullahi* at 182 (citation omitted). Informed consent requirements are a cornerstone of FDA rules governing human medical experimentation. *See, e.g.*, 21 C.F.R. §§ 50.20.

with comorbidities are at significantly higher risk for death or serious health complications, while younger and healthier patients face a vanishingly small risk. The CDC's best estimate of the infection fatality rate for people ages 18-49 years is under 0.06% meaning that young adults have a 99.94% survivability rate.

53. Notably, substantial research establishes that COVID-19 infection creates immunity to the virus *at least* as robust, durable, and long-lasting as that achieved through vaccination; and many experts maintain that natural immunity far surpasses immunity gained through vaccination by as much as twenty times (20x). In other words, for those Plaintiffs who have had natural exposure and recovered, there is no legitimate scientific or medical reason to require they be inoculated, take PCR tests, or force them to wear masks.

A. Israeli Study

54. Notably, a study conducted in Israel (the "Israeli Study"), one of the most vaccinated countries on Earth and the "largest real-world observational study comparing natural immunity" gained from COVID-19 infection and "vaccine-induced immunity" from the BioNTech Vaccine[19]. The Israeli Study concluded

---

[19] "After conducting a retrospective observational study comparing: (1) SARSCoV-2-naïve individuals who received a two-dose regimen of the BioNTech/Pfizer mRNA BNT162b2 vaccine, (2) previously infected individuals who have not been vaccinated, and (3) previously infected and single dose vaccinated individuals a two-dose regimen

that: "natural immunity confers longer lasting and stronger protection against infection, symptomatic disease and hospitalization caused by the Delta variant of SARS-CoV-2" compared to BioNTech vaccine immunity. *Id*. Specifically, fully vaccinated individuals with no previous infections had a "statistically significant 13.06-fold (95% CI, 8.08 to 21.11) increased risk for breakthrough infection [with the Delta variant] as opposed to reinfection (P<0.001)" of those previously infected. *Id*. With respect to symptomatic disease, the fully vaccinated had a "27.02-fold risk (95% CI, 12.7 to 57.5) symptomatic breakthrough infection as opposed to reinfection (P<0.001). *See Id*. Accordingly, there is an approximate 4:1 ratio of fully vaccinated to unvaccinated people being admitted to hospitals and expiring from COVID-19 in Israel.  It is the vaccinated who are at the greatest risk of infection, sickness, and death according to the Israeli Study.

B.  Cleveland Clinic Study

55. A five-month study looking at reinfection rates in employees of the Cleveland Clinic Health System previously infected with SARS-COV-2 found that none of the 1,359 previously infected subjects who remained unvaccinated were

----

of the BioNTech/Pfizer mRNA vaccine, SARS-CoV-2-naïve vaccinees **had a 13.06-fold** (95% CI, 8.08 to 21.11) increased risk for breakthrough infection with the Delta variant compared to those previously infected." https://www.medrxiv.org/content/10.1101/2021.08.24.21262415v1.full.pdf

reinfected with the virus despite being surrounded by the virus and Covid disease in the hospital[20].

56. The study examined the rates of SARS-COV-2 infection in vaccinated and unvaccinated individuals which showed that "those previously infected who did not receive the vaccine had lower rates of SARS-CoV-2 infection than those previously infected who did receive the vaccine, thereby providing direct evidence that vaccination does not add protection to those who were previously infected…;" and the study concluded "individuals who have had SARS-CoV-2 infection are unlikely to benefit from COVID vaccination…"

C. Longitudinal Study

57. Natural immunity responses to mutated forms of COVID is further supported by the results of a longitudinal analysis of 254 patients over eight months[21]. This study found that SARsS-CoV-2 infection produces "broad and effective immunity" that "may persist long-term in recovered COVID-19 patients." Thus, natural immunity is robust and effective.

---

[20]   https://www.medrxiv.org/content/10.1101/2021.06.01.21258176v2.full   (last   visited October 1, 2021)

[21] Kristen W. Cohen, et al., Longitudinal Analysis Shows Durable and Broad Immune Memory after SARS-CoV-2 Infection with Persisting Antibody Responses and Memory B and T Cells, CELL REPORTS MEDICINE 2, 100354 (July 20, 2021), available at: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8253687/ (last visited Sept. 22, 2021).

D.  <u>Attached Expert Opinions and Others</u>

58. The information above algins with the attached affidavits and further demonstrates why Plaintiffs should not be subjected to President Biden's Executive Orders or employer mandates. For example, Dr. Smith attest: "If someone has immunity from natural infection, *under no circumstances would it make sense for them to get a vaccine*… Active immunity (i.e., natural exposure and recovery) *is always better and stronger than passive immunity* like through the vaccines/gene therapies." See Ex. C. Since persons like Plaintiffs have immunity and/or have naturally formed antibodies immunity, then they are past the point of infection; and even if 100% of the population is vaccinated, the virus will spread. Plaintiffs also note:

> ➢ Necessity of COVID-19 vaccination in previously infected individuals[22], by Nabin K. Shrestha, Patrick C. Burke, Amy S. Nowacki, Paul Terpeluk, Steven M. Gordon, MedRxiv, June 5, 2021. "Individuals who have had SARS-CoV-2 infection are unlikely to benefit from COVID-19 vaccination, and vaccines can be safely prioritized to those who have not been infected before."

> ➢ SARS-CoV-2 infection induces long-lived bone marrow plasma cells in humans[23], by Jackson S. Turner, Wooseob Kim, Elizaveta Kalaidina, Charles W. Goss, Adriana M. Rauseo, Aaron J. Schmitz,

---

[22] https://www.medrxiv.org/content/10.1101/2021.06.01.21258176v2
[23] https://www.nature.com/articles/s41586-021-03647-4

Lena Hansen, Alem Haile, Michael K. Klebert, Iskra Pusic, Jane A. O'Halloran, Rachel M. Presti, Ali H. Ellebedy. Nature, May 24, 2021. "This study sought to determine whether infection with SARS-CoV-2 induces antigen-specific long-lived BMPCs in humans. We detected SARS-CoV-2 S-specific BMPCs in bone marrow aspirates from 15 out of 19 convalescent individuals, and in none from the 11 control participants…. Overall, our results are consistent with SARS-CoV-2 infection eliciting a canonical T-cell-dependent B cell response, in which an early transient burst of extrafollicular plasmablasts generates a wave of serum antibodies that decline relatively quickly. This is followed by more stably maintained levels of serum antibodies that are supported by long-lived BMPCs."

➢ Natural immunity against COVID-19 significantly reduces the risk of reinfection: findings from a cohort of sero-survey participants[24], by Bijaya Kumar Mishra, Debdutta Bhattacharya, Jaya Singh Kshatri, Sanghamitra Pati. MedRxiv, July 19, 2021. "These findings reinforce the strong plausibility that development of antibody following natural infection not only protects against re-infection by the virus to a great extent, but also safeguards against progression to severe COVID-19 disease."

**IV.  FEDERAL REGULATIONS AND LICSENSING FOR EUA PRODUCTS**

59.  The FDCA generally prohibits anyone from introducing or delivering for introduction into interstate commerce any "new drug" or "biological product" unless and until the FDA has approved the drug or biological product as safe and

---

[24] https://www.medrxiv.org/content/10.1101/2021.07.19.21260302v1

32

effective for its intended use. 21 U.S.C. §§ 331(a), 355(a); 42 U.S.C. § 262(a). Coincidingly, 42 U.S.C. § 262(a)(2)(C)(i)(I) requires approval of biological products and proven demonstration they are "safe, potent, and pure." *See also* 21 C.F.R. § 601.2(a). No such requirements are mandated for EUA products.

60. A vaccine is both a drug and a biological product and therefore subject to regulation under both the FDCA and the Public Health Service Act ("PHSA"). *See* 21 U.S.C. § 321(g); 42 U.S.C. § 262(i)(1). Pursuant to Section 351(a) of the PHSA, 42 U.S.C. § 262(a), the FDA has the authority to approve the sale and manufacture of vaccines and other biologics like the Pfizer Comirnaty Vaccine. The biologics application addresses not only the safety and efficacy of the product, but also covers specific labeling and manufacturing requirements, including the location, process, and storage. EUA products are subject to much lower standards than those required for licensed products, and they are exempt altogether from certain marketing and manufacturing requirements.

61. Notably, "interchangeable" and "interchangeability" are specifically defined terms in Section 351 of the PHS Act, 42 U.S.C. § 262[25], in relation to a

---

[25] "Interchangeable" and "interchangeability" are defined as a "biological product" that "may be substituted for the reference product" by health care providers. 42 U.S.C. § 351(i)(3). To meet the standards in 42 U.S.C. §262(k)(4) ("Safety standards for determining interchangeability"), the "interchangeable" or substitute biological product (i) must be

"reference product," which is a biological product licensed under Section 351(a) of the PHSA. 42 U.S.C. § 262(a)[26]. For purposes of determining "interchangeability," the "reference product" must be an FDA-licensed product; like in this case, the FDA-licensed Pfizer, Comirnaty Vaccine. But the "interchangeable" product, the EUA BioNTech Vaccine, must be the subject of a later-filed "abbreviated" application under 42 U.S.C. § 262(k). There is no indication, however, that such application was filed by BioNTech, much less reviewed or approved by the FDA.

62. The FDCA authorizes the FDA to issue an EUA for a medical drug, device, or biologic, where certain conditions have been met: that the HHS Secretary has declared a public health emergency that justifies the use of an EUA, 21 U.S.C. §360bbb-3(b)(1), and the FDA finds that "there is no [1] adequate, [2] approved, and [3] available alternative to the product for diagnosing, preventing, or treating" the disease in question. 21 U.S.C. § 360bbb-3(c)(3).

---

biosimilar to the reference product and (ii) and "can be expected to produce the same clinical result as the reference product in any given patient." 42 U.S.C. § 262(k)(4).

[26] These definitions and related provisions were enacted as part of the Biologics Price Competition Act of 2009, which "amends the PHSA and other statutes to create an abbreviated licensure pathway," under Section 351(k) of the PHSA, 42 U.S.C. § 262(k), "for biological products shown to be interchangeable with an FDA-licensed biological reference product," licensed under Section 351(a) of the PHS Act, 42 U.S.C. § 262(a). *See generally* FDA, et al., Considerations in Demonstrating Interchangeability with a Reference Product: Guidance for Industry (May 2019), available at: https://www.fda.gov/media/124907/download (last visited Sept. 15, 2021).

63. There are significant differences between licensed vaccines and those subject to EUA that render them "legally distinct." First, the requirements for efficacy are much lower for EUA products than for licensed products. EUAs require only a showing that, based on scientific evidence "if available," "it is reasonable to believe," the product "may be effective" in treating or preventing the disease. 21 U.S.C. §360bbb-3(c)(2)(A). Second, the safety requirements are minimal, requiring only that the FDA conclude that the "known and potential benefits … outweigh the known and potential risks" of the product, considering the risks of the disease. 21 U.S.C. §360bbb-3(c)(2)(B). Third, EUA products are exempt from certain manufacturing and marketing standards, enjoy broader product liability protections, and cannot be mandated due to informed consent laws and regulations (subject to the override procedures for service members described below). *See, e.g., Doe v Rumsfeld*, 341 F. Supp. 2d 1, 19 (D.D.C. 2004).

64. The public health emergency declaration that justifies the use of an EUA for a product "shall terminate upon the earlier of … a change in the approval status" of the EUA product. 21 U.S.C. § 360bbb-3(b)(2)(A)(ii). Thus, the approval, or licensing, of a vaccine for a given indication terminates the EUA for that vaccine. The requirements for licensing and emergency use authorization are mutually

exclusive; the same product—or same vial of vaccine—cannot be concurrently subject to an EUA and licensed for the same indication or use, under distinct regulatory regimes[27]. Yet that is precisely what the FDA has done by: (1) simultaneously licensing Comirnaty Vaccine and re-issuing the EUA for the BioNTech Vaccine for the same indication (individuals 16 years or older); (2) re-issuing and expanding the existing BioNTech Vaccine EUA for children of 12-15 years of age and permitting the licensed Comirnaty Vaccine to be used for this group; and (3) finding that the EUA BioNTech Vaccine and licensed Comirnaty Vaccine can be used "interchangeably" and may be substituted for each other.

## V.   THE TESTING AND REVIEW OF THE COVID-19 VACCINES

65.   Neither the BioNTech Vaccine nor the Comirnaty Vaccine has been tested in clinical trials for its safety and efficacy on individuals who have recovered from COVID-19. To the contrary, the trials conducted thus far have specifically *excluded* survivors of previous Covid infections[28]. Likewise, the clinical trials skipped testing for genotoxicity, mutagenicity, teratogenicity, and oncogenicity testing;

---

[27] *See, e.g., Genus Med. Techs. LLC v. FDA*, 994 F.3d 631 (D.C. Cir. 2020) (holding that the FDA's determination that it could choose to regulate a product as either a drug or a device, or both, as arbitrary and capricious and exceeding its statutory authority).

[28] *See* Fabio Angeli, SARS-CoV-2 vaccines: Lights and Shadows, EUROPEAN J. OF INTERNAL MEDICINE 2021;88:1-8.

and did not include participants from and/or provide sufficient data for other "special populations" such as those with autoimmune disorders, hematological conditions, children, and the elderly. Shockingly, just 2 ½ months after the FDA's issuance of the Comirnaty EUA, **according to Pfizer's own studies and documentation**, from December 01, 2021 – February 2021, there was a total of 42,086 case reports (25,379 medically confirmed and 16,707 non-medically confirmed) containing 158,893 'events':

> …in the overall dataset, were General disorders and administration site conditions (51,335 AEs), Nervous system disorders (25,957), Musculoskeletal and connective tissue disorders (17,283), Gastrointestinal disorders (14,096), Skin and subcutaneous tissue disorders (8,476), Respiratory, thoracic and mediastinal disorders (8,848), Infections and infestations (4,610), Injury, poisoning and procedural complications (5,590), and Investigations (3,693)."

*See* FDA documents from Pfizer attached as **Ex. 123**.

## VI.  THE VACCINES (OR GENE THERAPIES) AND THEIR CONTENTS

66.   The vaccines are ineffective against the SARS-CoV-2 virus and its variants. Consistent between all manufactures, these vaccines *cannot prevent infection* from the SARS-COV-2 virus. They *cannot prevent the transmission* of the SARS-COV-2 virus. They *cannot prevent death* as a result of the SARS-COV-2 virus. That was never their intent. This necessarily means the vaccines at issue cannot prevent the COVID-19 disease. This is supported by the affidavits attached and even the CDC

Director, Michelle Walensky, when on August 05, 2021, in a CNN interview she was clear: "Our vaccines are working exceptionally well. They continue to work well for delta with regard to severe illness and death...*But what they can't do anymore is prevent transmission.*[29]"

67. The vaccines are not vaccines in the traditional sense; but instead, gene therapies. The COVID-19 Vaccines employ novel technology, namely, mRNA delivered via nanolipids. These vaccines are produced from gene therapy molecular platforms whose safety and efficacy has not been fully assessed. This is unlike all other vaccines where there is a set amount of antigen or a live-attenuated virus is injected into the body to allow one's natural immunity apparatus to develop natural antibodies to the antigen or virus.

68. Two of the 'vaccines' use mRNA to encode the spike protein of the SARS-CoV-2 virus and are the first of this type of approach to be granted EUA status for human use. The third (Janssen/J&J) is a recombinant, virus vector vaccine using  a human adenovirus type 26 virus that expresses the SARS-CoV-2 spike protein.

---

[29] https://www.cnn.com/2021/08/05/health/us-coronavirus-thursday/index.html

Essentially, these vaccines simulate the antibody the body might naturally make. As explained by Dr. Smith (Ex. C), these 'vaccines' harness the power of basic biology to produce the spike protein of SARS-CoV-2. Messenger RNA (mRNA) is genetic material that tells your body how to make proteins. The central dogma of molecular biology states that DNA makes RNA which makes proteins. Through the processes of transcription (DNA→RNA) and translation (RNA→ protein), information from genes is used to make proteins. Some of the proteins that are formed from the genetic information are needed to fight diseases.

69.   Dr. Smith's explanation aligns with FDA's own Peter Marks M.D., PH.D., Director of the Center for Biologics Evaluation and Research of FDA who states:

> The active ingredient or component in the 3 FDA authorized used Covid vaccines is a piece of genetic material that leads the body to briefly make a protein that's normally found on the surface of the virus that causes Covid. [30]

70.   Some of the ingredients listed in these vaccines are not safe for use in humans.  As outlined above, EUA use is not the same as an FDA approval; nor are the laws, rules, and regulations that govern same. For instance, Pfizer, Moderna, and J&J have not disclosed all the content of what is contained in the vaccines. This

---

[30] https://www.fda.gov/emergency-preparedness-and-response/coronavirus-disease-2019-covid-19/covid-19-vaccines#basics (last visited September 7, 2021).

is particularly alarming considering Lieutenant Colonel Theresa Long ("LTC Long") stated in her sworn statement that one of the primary ingredients of the Lipid Nanoparticle delivery system is "ALC 1035." Under the OSHA HCS regulations (21 CFR 1910), it includes several concerning warnings regarding ALC 1035 including: to "seek medical attention if it comes into contact with your skin; "if inhaled and if breathing is difficult, give cardiopulmonary resuscitation; and evacuate if there is an environmental spill." And both the Comirnaty (Pfizer) package insert and Moderna Fact Sheet for Recipients and Caregivers list *polyethylene glycol* as one of the vaccine primary ingredients[31] -- the same, active ingredient in antifreeze – and the SDS for polyethylene glycol cautions that it is **not advised for use in drugs or food**[32].

71.  According to the FDA, there is insufficient data to know whether the Covid Vaccines actually prevent asymptomatic infection or prevent transmission of SARS-CoV-2; and data from the U.S.[33] and abroad suggest that they do not prevent

---

[31] https://www.fda.gov/media/144638/download;
https://www.fda.gov/media/151707/download
[32] https://www.fishersci.com/store/msds?partNumber=AC418040010&productDescriptio
n=POLYETHYLENE+GLYCOL+1450+1KG&vendorId=VN00032119&countryCode=US&
language=en
[33] See Catherine M. Brown, DVM, et al., Outbreak of SARS-CoV-2 Infections, Including
COVID-19 Vaccine Breakthrough available at:
https://www.cdc.gov/mmwr/volumes/70/wr/mm7031e2.htm?s_cid=mm7031e2_w#

the virus or disease COVID-19 either. The protection offered from the BioNTech Vaccine drops off significantly over time, particularly after the six-month period on which the FDA relied in conditionally approving the Comirnaty Vaccine. For example, recent and well-publicized studies from Israel found that the BioNTech Vaccine's effectiveness decreased from over 90% to 39% after six months for infections and 40.5% for symptomatic cases[34].

72. Notably, relevant safety data and efficacy statistics are suspect and unreliable as clinical trials for these vaccines are scheduled to continue through 2023 to 2025. Therefore, it is impossible to assess or know the safety and efficacy of these vaccines, their necessity, and whether their benefits outweigh the risks in even intermediate timeframes.

73. At the September 17, 2021 FDA Advisory Committee meeting to consider approval of booster shots, Sara Oliver MD, MSPH presented an overview of studies demonstrating the rapidly declining efficacy of the Pfizer-BioNTech

---

[34]Israel Ministry of Health Presentation (July 23, 2021), available at: https://www.gov.il/BlobFolder/reports/vaccine-efficacy-safety-follow-up committee/he/files_publications_corona_two-dose-vaccination-data.pdf (summarizing six-month efficacy data for Pfizer-BioNTech vaccine in Israel); see also Rory Jones & Dov Lieber, Pfizer COVID-19 Vaccine Is Less Effective Against Delta available at: https://www.wsj.com/articles/pfizer-covid-19-vaccine-is-less-effective-against-   delta-infections-but-still-prevents-serious-illness-israel-study-shows-11627059395.

vaccine, in the United States and abroad[35]. Several U.S. studies found that the efficacy of Covid vaccines dropped from over 90% to as 42% (with a median of roughly 65%) over an up to six-month period, with the steepest drops found in the studies with the longest study periods; the only study limited to the Pfizer-BioNTech vaccine got the low score of 42%. Dr. Oliver also presented studies finding a steep decline in efficacy 15%-35% for the pre-Delta vs. the Delta variant. Id. She also presented international studies showing even sharper decreases in efficacy in countries such as Qatar where the Delta variant was prevalent at an earlier date. *Id*.

74. Data continues to come out weekly that reports these vaccines do not work as advertised; and seemingly do more harm than good. For instance, in October 2021, for example, COVID-19 case data from Maine and Vermont, two (2) of the most heavily vaccinated states in the U.S., suggests that vaccinated individuals are likely still catching and transmitting COVID; and contributing to case numbers with the State of Vermont[36] at 72% and Maine[37] at 69%. And as John Hopkins University admits, even with high numbers of COVID-19 vaccinations: "We are

---

[35] https://www.fda.gov/media/152243/download

[36] https://coronavirus.jhu.edu/region/us/vermont

[37] https://coronavirus.jhu.edu/region/us/maine

unlikely to eradicate COVID-19 or even to get it to the level of something like measles in the U.S.[38]"

75. Abroad, despite having its third and fourth booster shots, the number of rising cases and deaths is growing significantly in Israel; Singapore's Ministry of Health[39] reported a major increase in COVID-19 breakthrough cases and deaths despite having 85% of their citizens vaccinated[40]; and Scottish Data released November 24, 2021, shows how 74% of the Covid hospitalizations in the past month are in the vaccinated (See Table 19, 20)[41].

76. Notably, for an EUA approval, there must be no alternative, effective treatments available for use against the disease. There are now well-studied, safe and reliable alternatives to vaccination for prevention and treatment of COVID-19, including, but not limited to Ivermectin, Methylprednisolone, Fluvoxamine, Hydroxychloroquine, Vitamin C, Vitamin D3, Zinc, Melatonin, Aspirin, corticosteroids, monoclonal antibodies, and other accessible therapies. As a

---

[38] https://publichealth.jhu.edu/2021/what-is-herd-immunity-and-how-can-we-achieve-it-with-covid-19

[39] Ministry of Health available at: https://www.moh.gov.sg/news-highlights/details/update-on-local-covid-19-situation-(8-oct-2021)

[40] https://covid19.who.int/region/euro/country/il;https://covid19.who.int/region/wpro/country/sg

[41] https://publichealthscotland.scot/media/10462/21-11-24-covid19 publication_report.pdf

treating physician, Dr. Edwards states: "Multiple published studies as well as me and my colleagues' clinical experience shows that there are exceedingly effective early outpatient therapies for Covid that can reduce hospitalization and mortality rates by 80-90%, even in an unhealthy, high-risk population." *See* affidavits attached whose opinion is supported by Dr. McCullough.

## VII. PRESIDENT BIDEN'S ORDERS AND EMPLOYER MANDATES

77. On his first day in office, President Biden signed Executive Order 13991, which established the Safer Federal Workforce Task Force whose mission is to "provide ongoing guidance to heads of agencies on the operation of the Federal Government, the safety of its employees, and the continuity of Government functions during the COVID–19 pandemic." 86 Fed. Reg. 7,045–48 (Jan. 20, 2021).

78. As late as July 23, 2021, the White House announced that mandating vaccines is "not the role of the federal government[42];" yet on September 9, 2021, President Biden announced that his patience was "wearing thin" with unvaccinated Americans[43] and issued Executive Order 14042 on "Requiring

---

[42] https://www.nytimes.com/video/us/politics/100000007884901/vaccine-mandate-not-federal-role-psaki.html (last visited December 3, 2021).
[43] Office of Public Engagement, Transcript, Remarks by President Biden on Fighting the COVID-19 Pandemic (Sept. 9, 2021), https://www.whitehouse.gov/briefingroom/speeches-remarks/2021/09/09/remarks-by-president-biden-on-fighting-thecovid-19-pandemic-3/.

Coronavirus Disease 2019 Vaccination for Federal Employees" and Executive Order 14043 "Ensuring Adequate COVID Safety Protocols for Federal Contractors." Collectively, these mandates required that all federal employees and contractors be fully vaccinated – including Plaintiffs.

79. While the enforcement arm of the vaccine mandate, the Emergency Temporary Standard issued by the Occupational Safety and Health Administration ("OSHA") (published in the Federal Register on November 5, 2021 at Volume 86, pages 61402 through 61555 ("the ETS"), has been temporarily suspended; employers, like Plaintiffs', continue to mandate the vaccines. *See* correspondences from Plaintiffs' employer attached as a composite as **Exhibit H**.

80. The policies and practices are facially unlawful; as well as, discriminatory as evidenced by the unequal treatment between the vaccinated and unvaccinated. There are no legally permissible FDA-licensed (approved) vaccines to prevent infection with SARS-CoV-2. Since these vaccines are Emergency Use Authorized, they cannot be made compulsory: "When Dr. Amanda Cohn, the executive secretary of the CDC's Advisory Committee on Immunization Practices, was asked if Covid-19 vaccination can be required, she responded[44] that under an

---

[44] https://www.cdc.gov/vaccines/acip/meetings/downloads/min-archive/min-2020-08-508.pdf

EUA, "vaccines are not allowed to be mandatory. So, early in this vaccination phase, individuals will have to be consented and they won't be able to be mandatory." Cohn later affirmed this prohibition on requiring vaccines applies to organizations, including hospitals[45]." Therefore, if Federal law and the CDC have expressly prohibited forced inoculations, and the U.S. Constitution forbids same, employer cannot require vaccine passports or require some other sort of "proof" of vaccination as it is effectively just a talisman or guise to coerce Plaintiffs and their colleagues into compliance.

81.  Additionally, the data is clear that those who had been infected with SARS-CoV-2 and developed the disease will have immunity[46]; and therefore, it is medically irrelevant to vaccinate them[47].

82. The Government, unions, employers, and vaccine manufactures like Pfizer are advancing an unlawful political narrative and destructive, health agenda by their failure to candidly and expressly disclose:

- o   The known and potential, serious risks associated with the vaccines.
- o   That the employee assumes all risk associated with the vaccine.
- o   That the long-term adverse effects are unknown.

---

[45] https://www.fda.gov/media/143982/download
[46] https://www.nih.gov/news-events/nih-research-matters/lasting-immunity-found-after-recovery-covid-19)
[47] https://science.sciencemag.org/content/371/6529/eabf4063.

o Emerging evidence and data as to the vaccine's lack of effectiveness.

o Multiple mRNA injections per year will likely be required – the safety of which is unknown.

o Vaccinated individuals can still catch and spread COVID.

o The fact that sick people – irrespective of their vaccination status- are the ones most likely to spread the virus.

o Those employees who have been injured by the vaccine.

o That COVID is treatable and has a survival rate of >98% for all age groups, co-morbidities, races, special populations and socio-economic classes combined (generally comparable to the flu at 99% or tuberculosis at 92% or community acquired pneumonia)[48]

83. These mandates or requirements are suspect at best and appears nefarious given their unwillingness to assume liability for any short or long-term harms or deaths this gene therapy / vaccine mandate can cause; and the vaccine

---

[48] CDC COVID Data Tracker https://covid.cdc.gov/covid-data-tracker/#datatracker-home COVID crude mortality ratio (the number of reported deaths divided by the reported cases) as of September 17, 2021:

666,440 deaths ÷ 41,593,179 cases = 0.016 x 100 = 1.6% died

100 – 2% = 98.4% survived.

CDC. Estimated Influenza Illnesses, Medical Visits, Hospitalizations and Deaths in the United States – 2017-2018 Influenza Season.  Available from:

https://www.cdc.gov/flu/about/burden/2017-2018.htm

Flu crude mortality ratio (the number of reported deaths divided by the reported cases):

6100 deaths ÷ 45,000,000 cases = 0.0013 x 100 = 0.13% died

100 – 0.13% = 99.8% survived

CDC Tuberculosis in the United States 2020.

https://www.cdc.gov/nchhstp/newsroom/docs/factsheets/TB-in-the-US-508.pdf

542 deaths ÷ 7,163 cases = 0.08 x 100 = 7.5% died

100-7.5% = 92.4% survived.

Community Acquired Pneumonia

https://pubmed.ncbi.nlm.nih.gov/29020164/

manufactures have immunity themselves (emphasis added). So, the vaccine manufactures are making billions of dollars and have no liability for millions of injuries and thousands of deaths they are causing – from a virus and disease that have the same impact as the seasonal flu.

84. Vaccinated individuals who suffer one of the numerous adverse effects cannot apply for the U.S. National Vaccine Injury Compensation Program and the U.S. Countermeasures Injury Compensation Act does not adequately compensate those who are injured (this program rarely pays, caps payout, only covers vaccine injuries manifesting within one year of injection).

85. Per the FDA's own VRBPAC PowerPoint presentation, slide 16, dated October 22, 2020[49], it acknowledges numerous, possible serious adverse events that can result in permanent injuries, autoimmune diseases, chronic diseases, disabilities, and death from the COVID-19 vaccines.



---

[49] https://www.fda.gov/media/143557/download

Even if other sources of information are ignored, the VAERS an WHO data alone sufficiently establishes that very serious side effects from the vaccines are more common than "extremely unlikely;" and certainly not "safe."

## VIII. PLAINTIFFS' BELIEFS ABOUT THE VACCINES

86.  Title VII of the Civil Rights Act of 1964, as amended makes it unlawful for an employer to discriminate against an employee on the basis of religion. This "include[s] all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate an employee's…religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). An employer has the statutory obligation to make reasonable accommodations for the religious observances of its employees so long as they do not incur undue hardship[50]; and prohibits employers from retaliating against an employee for their beliefs.

87. Plaintiffs and many of their colleagues have sincere, religious beliefs that they should not be inoculated with the COVID-19 vaccines. Plaintiffs share

---

[50] *See Eversley v. Mbank Dallas*, 843 F.2d 172, 175 (5th Cir. 1988). "Undue hardship" exists, as a matter of law, when an employer is required to bear more than a de minimus cost." *Weber v. Roadway Express, Inc.*, 199 F.3d 270, 272-73 (5th Cir. 2000) citing *Transworld Airlines, Inc. v. Hardison*, 432 U.S. 63 at 84 (1977); *Brener v. Diagnostic Center Hosp.*, 671 F.2d 141, 146 (5th Cir. 1982).

common beliefs with other Christians like that life is sacred and a gift from God; and that these vaccines alter the human cell by disrupting God's designed immune system with a synthetically engineered mRNA, spike protein. As previously noted, these vaccines are not vaccines by the traditional definition, but rather, gene therapies which alter cell behavior at the micro-cell biological level. These vaccines change DNA and RNA functions within the cell; and thereby modify the genetic make-up. Plaintiffs maintain that they do not believe it permissible to fundamentally change the genetic design that God imparted within them.

88.   As fetal tissues were integral in the vaccines' development, this also violates many of Plaintiffs' sincerely held religious beliefs. By way of further explanation, in their early development, fetal tissues were used to test that the mRNA worked as intended; ergo, but for the use of fetal tissue, the vaccines would not exist. As uncovered in Congressional investigations and hearings[51], bio-procurement companies sold fetal tissues; and numerous actors within the abortion industry had committed systemic violations of same. In short, Plaintiffs do not believe they

---

[51] *See* Select Investigative Panel of the Energy & Commerce Committee, FINAL REPORT (Dec. 30, 2016); Majority Staff Of S. Comm. On The Judiciary, 114TH CONG., Human Fetal Tissue Research: Context And Controversy, S. DOC. NO. 114-27 (2d Sess. 2016).

should support or engage in a practice that relates to, or could reward an industry

where the fetal tissues from unborn, human children have been monetized.

89.   Other beliefs shared by Plaintiffs common with other Christians[52] which

demonstrate the sincerity of their beliefs and why Plaintiffs maintain they have

the right to opt out of employer-mandated vaccines include: (i) Vaccination is not

morally obligatory so therefore, such decision must be voluntary; (ii) The Lord is

all powerful and can protect and heal them if that is His will; (iii) there is a general

moral duty to refuse the use of medical products, including certain vaccines, that

are produced using human cells lines; (iv) a person's informed judgments about

the proportionality of medical interventions are to be respected unless they

contradict authoritative Christian moral teachings; and (v) a Christian is morally

required to obey his or her sure conscience.

## IX.   WHERE IS THE DEPARTMENT OF LABOR OR EEOC?

90.   The U.S. Equal Employment Opportunity Commission's ("EEOC")

website[53] states, "the EEO laws, including the ADA and Rehabilitation Act,

continue to apply during the time of the COVID-19 pandemic…" and as noted by

---

[52] *See* other similarly shared Christian beliefs in the U.S. District Ct. for District of
Colombia; Case 1:21-cv-02484
[53] https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-
rehabilitation-act-and-other-eeo-laws#A

the U.S. Department of Health and Human Services, "the civil rights protections and responsibilities of these federal laws apply even during emergencies. They cannot be waived.[54]"

91. That said, however, the EEOC has taken the position that they do not and will not interfere with or prevent employers from following the guidelines and suggestions made by the CDC or state/local public health authorities about steps employers should take regarding the COVID-19 vaccine:

> *The EEOC has received many inquiries from employers and employees about the type of authorization granted by the U.S. Department of Health and Human Services (HHS) Food and Drug Administration (FDA) for the administration of three COVID-19 vaccines. These three vaccines were granted Emergency Use Authorizations (EUA) by the FDA. It is beyond the EEOC's jurisdiction to discuss the legal implications of EUA or the FDA approach. Individuals seeking more information about the legal implications of EUA or the FDA approach to vaccines can visit the FDA's EUA page[55].*

92. Such proposals from these agencies and/or outright commands or orders from the Biden administration, however, do not comport with the law and include the exact, unlawful employment practices Plaintiffs and their colleagues complain about in this complaint.

---

[54] https://www.hhs.gov/civil-rights/for-providers/civil-rights-covid19/guidance-long-covid-disability/index.html#footnote7_36mgn6l

[55] https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws#K

93. Defendant's and Plaintiffs' employers' actions flagrantly violate numerous provisions of the Constitution and Federal laws; meanwhile, the Department of Labor and the EEOC (referenced hereinafter together as "EEOC") have not taken any legal actions much less made public statements condemning these patently unlawful practices. For these reasons and those outlined below, Plaintiffs are not required to first seek recourse via the EEOC prior to bringing their claims.

94. Chiefly, irreparable harm will result from the delays associated with exhaustion of administrative remedies. As noted throughout the complaint, millions of people have been hurt and thousands have been killed due to the COVID-19 vaccines that United are mandating Plaintiffs and their colleagues take. In turn, waiting 180 days for the process to complete or the receipt of a right to sue letter is not a viable option as irreparable harm is imminent not just for their jobs; but for their lives. *See* www.eeoc.gov/what-you-can-expect-after-you-file-charge

95. Additionally, the EEOC lacks the institutional capacity to resolve the particular types of issues presented given there are millions of employees across the United States who seek to challenge these mandated practices, and the EEOC does not have enough staff/personnel to review all the claims and the Courts' intervention is needed. Also, the EEOC does not have the authority to address the

constitutionality of all the claims associated with the employment practices at issues and does not possess the institutional knowledge or authority to redress those matters germane to health, safety and welfare which according to the Constitution, are to be left for the states. Therefore, requiring Plaintiffs to exhaust administrative remedies would be futile; or useless and inadequate to redress Plaintiffs' employment issues and to prevent the irreparable harms.

96. Notably too, the fact that OSHA, the agency that monitors workplace safety and compliance, is not requiring adverse event recordings is a red flag. This transparent neglect, lack of enforcement, and accountability nefariously masks vaccine adverse events and does not facilitate employer/employee rights to be fully informed regarding risks when making vaccine decisions. As such, Plaintiffs' employer effectively serves as their own, self-regulating employment and health agency when enforcing President Biden's orders via mandate.

## X.    OBSERVED DANGERS IN THE WORKPLACE

97.  Plaintiffs have witnessed and have knowledge of vaccinated co-workers who have experienced vaccine-related injuries and side effects. Several plaintiffs detail situations where co-workers present uncharacteristically strange symptoms after taking the vaccine including brain fog or a lack of cognitive clarity, neurological disorders, or vision impairment.

98.   Plaintiffs have first-hand knowledge of and have witnessed an increase in stress-related mistakes and errors occurring at the workplace in these critical areas due to the increased stress load that the vaccine mandate has caused among those reluctant to take the vaccine and those who were forced to take it when they otherwise would not have. These issues have been reported to Plaintiffs' employer; however, rather than taking measures to redress these safety concerns, they have refused to take any substantive, corrective action; or definitively retract its unlawful, universal vaccination mandate.

## CLASS ALLEGATIONS

99.   Plaintiffs seek relief in their individual capacity and to represent a class consisting of all others similarly situated seeking certification of a class pursuant to Federal Rule of Civil Procedure 23(a) and (b)(2) and/or (b)(3) as defined as:

> All persons subject to government or employer COVID-19 vaccination mandates and any medical products related to same. This includes PCR testing; proof of vaccination or vaccine passports; and/or mask policies.

100. *Numerosity.* Fed. R. Civ. P. 23(a)(1). The potential members of the Class as defined are so numerous that joinder of all members is unfeasible and not practicable. While the precise number of Class members has not been determined

at this time, Plaintiff is informed and believes there are over 160 million people who are directedly affected by employer or government mandates.

101. *Commonality.* Fed. R. Civ. P. 23(a)(2) and (b)(3). There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class members. These common questions of law and fact include, without limitation: Whether government and/or employer COVID-19 vaccine mandates and similarly related products are unlawful or unconstitutional; and the nature of the relief, including equitable relief, to which Plaintiff and the Class members are entitled.

102. *Typicality.* Fed. R. Civ. P. 23(a)(3). Plaintiffs' claims are typical of the claims of the Class. Plaintiffs and all Class members have been exposed to Government and/or employer COVID-19 vaccine mandates and similarly-related products; as well as, exposed to disparate treatment arising out of COVID-19.

103. *Adequacy of Representation.* Fed. R. Civ. P. 23(a)(4). Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class. Plaintiffs' Counsel is competent and has experience in litigating class actions.

104. *Superiority of Class Action.* Fed. R. Civ. P. 23(b)(3). A class action is superior to other available methods for the fair and efficient adjudication of this

controversy since joinder of all the members of the Class is impracticable. Furthermore, the adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudication of the asserted claims. There will be no difficulty in the management of this action as it applies universally to all persons the same and subject to vaccine mandates.

105. *Injunctive and Declaratory Relief.* Fed. R. Civ. P. 23(b)(2). Defendant's actions are uniform to all members of the Class. Defendant has acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or declaratory relief is appropriate with respect to the Class as a whole.

106. Subclasses are not anticipated when moving for class certification as Plaintiffs contend these practices are wholly unconstitutional and unlawful.

## COUNT I

### Declaratory Judgment that Government and Employer Mandates are an Unlawful Usurpation of States' Rights and Police Power Authority

107.  Plaintiffs allege and incorporate by reference the foregoing allegations 1-106 as if fully set forth herein.

108.  The Tenth Amendment to the Constitution reserves powers **to the States and the people** that are not delegated to the Federal Government which includes the States' police powers. *United States v. Constantine*, 296 U.S. 287, 295-96 (1935).

109.  And the Supreme Court has made clear that the Constitution does not grant the federal government "general" or "plenary" authority; but rather:

> In our federal system, the National Government possesses only limited powers; the States and the people retain the remainder. Nearly two centuries ago, Chief Justice Marshall observed that "the question respecting the extent of the powers actually granted" to the Federal Government "is perpetually arising, and will probably continue to arise, as long as our system shall exist."

*Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 533–34 (2012) quoting *McCulloch v. Maryland*, 4 Wheat. 316, 405 (1819).

110.  The Government and employer mandates are flagrant affronts to the will of the American people, the Constitution and the Tenth Amendment, and an unlawful commandeering of authority from same. *See New York v. United States*, 505 U.S. 144, 175 (1992) (the federal government violates the Tenth Amendment

when it "cross[es] the line distinguishing encouragement from coercions."); *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1478, (2018) citing *Reno v. Condon*, 528 U.S. 141, 120 S.Ct. 666, 145 L.Ed.2d 587 (2000) (discussing States' sovereign authority to "regulate their own citizens." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1479, 200 L. Ed. 2d 854 (2018)); *see also South Carolina v. Baker*, 485 U.S. 505, 108 S.Ct. 1355, 99 L.Ed.2d 592 (1988).

111. As stated by the Supreme Court in *Alden v. Maine* (1999):

> The limited and enumerated powers granted to the Legislative, Executive, and Judicial Branches of the National Government, moreover, underscore the vital role reserved to the States by the constitutional design, see, e.g., Art. I, § 8; Art. II, §§ 2–3; Art. III, § 2. Any doubt regarding the constitutional role of the States as sovereign entities is removed by the Tenth Amendment, which, like the other provisions of the Bill of Rights, was enacted to allay lingering concerns about the extent of the national power. The Amendment confirms the promise implicit in the original document: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." *U.S. Const., Amdt.* 10; see also Printz, supra, at 919, 117 S.Ct. 2365; *New York v. United States*, 505 U.S. 144, 156–159, 177, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992).

*Alden v. Maine*, 527 U.S. 706, 713–14, 119 S. Ct. 2240, 2247, 144 L. Ed. 2d 636 (1999).

112. Put another way: if a power is delegated to Congress in the Constitution, then by necessary implication the Tenth Amendment expressly disclaims any reservation of that power to the States. On the flipside, it follows that if a power is

an attribute of state sovereignty reserved by the Tenth Amendment, it therefore follows that it is necessarily a power the Constitution has not conferred upon Congress – and certainly not a power reserved for the President by executive order. *United States v. Oregon*, 366 U.S. 643 (1961); *Case v. Bowles*, 327 U.S. 92 (1946); *Oklahoma ex rel. Phillips v. Guy F. Atkinson Co.*, 313 U.S. 508 (1941).

113. It is in this sense that the Tenth Amendment "states but a truism that all is retained which has not been surrendered." *United States v. Darby*, 312 U.S. 100, 124, 61 S.Ct. 451, 462, 85 L.Ed. 609 (1941). Indeed, "'Being an instrument of limited and enumerated powers, it follows irresistibly, that what is not conferred, is withheld, and belongs to the state authorities.'" *New York v. United States*, 505 U.S. 144, 156, 112 S. Ct. 2408, 2417–18, 120 L. Ed. 2d 120 (1992) quoting 3 J. Story, Commentaries on the Constitution of the United States 752 (1833).

114. The Supreme Court's decision on the scope of state police powers as it pertains to vaccinations has been addressed in *Jacobson v. Massachusetts*, 197 U.S. 11 (1905). There, the Court considered an appeal from a decision of the Massachusetts' Supreme Court finding the Commonwealth's mandatory smallpox vaccination program *was* within its authority under the "commonly called the police power - a power which the State did not surrender when becoming a

member of the Union under the Constitution." *Id*. at 25; *accord Buchanan v. Warley*, 245 U.S. 60, 74 (1917) ("The authority of the State to pass laws in the exercise of the police power, having for their object the promotion of the public health, safety and welfare is very broad ....").

115. President Biden's executive orders (along with any agencies or entity serving as the enforcement arm of same – OSHA ETS or otherwise) are unconstitutional usurpations of power he never had the authority to enact – much less the capacity to delegate their oversight to an inept and unqualified agency.

116. In a similar vein, employer mandates are patent usurpations of authority reserved for the States under the guise of presumably workplace safety; notwithstanding the overwhelming amount of evidence that these vaccines do not help stop the infection or transmission of SARS-CoV-2 virus or the COVID-19 disease, but can cause serious bodily harm and even death.

117. These employer-mandates and executive orders are carving out police powers they do not have the authority to exercise as they are reserved to the States or to "We the People." In short, should any behavior be curtailed in the name of health/safety, such decisions ought to be made in accordance with and pursuant

to the traditions our founders intended and the Constitution – they must be left for the States. *See generally Jacobson* (1905).

118. Plaintiffs' employer, like many others, have given Plaintiffs and their colleagues an unconscionable ultimatum which among other things, grossly violates numerous provisions of the Constitution: choose between their jobs[56] which afford them the ability to feed, clothe, and house their families – or – take an experimental, life-threatening vaccine which evidence suggests not only does more harm than good, but poses greater risks to those in the airline industry (emphasis added). And remarkably, the Department of Transportation, Federal Aviation Administration, nor any other agency has made any effort to stop these harms necessitating the Court's intervention (emphasis added).

119. The regulation of public health is a quintessential state function; and well beyond the scope of Federal powers, interstate commerce, or some form of tax.

120. The coercive orders and policies essentially force Plaintiffs to take a vaccine they do not need or want without their informed consent; impermissibly leverage their livelihoods and wellbeing against them and their families; and against many

---

[56] Or as described in *Truax*, "the right to earn a living by a calling for one's choice." *Truax v. Raich*, 239 U.S. 33, 41, (1915).

experts' medical advice (including their own doctors); thereby depriving them of meaningful choice and ability to refuse unwanted medical care.

121. While a state's police power is to yield if it is in conflict with the powers of the federal government as granted to it by the Constitution, such is not the case in this instance. Here, however, the Federal Government and employer-imposed mandates are the exact sort of activity the Constitution memorializes is improper and in place to thwart – it is tyrannical and must stop.

122. *Jacobson* instructs that "[t]he safety and health of the people of [a state] are, in the first instance, for that [state] to guard and protect. They are matters that do not ordinarily concern the National Government." *Jacobson* at 38. Just as they are not the Federal Government's to protect, nor are they private or public employers.

123. Plaintiffs have suffered and will continue to suffer damage from Defendants' conduct without the Court's intervention as there is no adequate remedy at law that can compensate Plaintiffs for the deprivation of their constitutional rights.

124. Plaintiffs will continue to suffer irreparable harm unless the Court enjoins employers from enforcing mandates; and President Biden's Executive Orders.

125. By interfering with the traditional balance of power between the States and the federal government, and by acting pursuant to ultra vires federal action, Defendants violated the Tenth Amendment and structural principles of federalism. The Government and employer mandates were thus adopted pursuant to unlawful and unconstitutional exercises of authority, and must be invalidated for the reasons provided.

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, respectfully pray for the following relief:

A.   That the Court issue a temporary restraining order restraining and enjoining Defendants and their officers, agents, employees, and attorneys, and all other persons in active concert or participation with them, from enforcing, threatening to enforce, attempting to enforce, or otherwise requiring compliance with employer or government COVID-19 Vaccine or other EUA Mandates as impermissible, unlawful, and/or contrary to the Constitutional and common law[57];

---

[57] The common law baseline is also a relevant touchstone out of which grew the relevant constitutional law. *See, e.g., Cruzan v. Dir., Mo. Dep't of Public Health*, 497 U.S. 261, 278 (1990) ("'At common law, even the touching of one person by another without consent and without legal justification was a battery'); *Schloendorff v. Society of N.Y. Hosp.*, 211 N.Y. 125, 129-130, 105 N.E. 92, 93 (1914) (Cardozo, J.) ('Every human being of adult years and sound mind has a right to determine what shall be done with his own body; and a surgeon who performs an operation without his patient's consent commits an assault, for which he is liable in damages.'). Subsequent Supreme Court decisions have made explicit

B. Issues a temporary restraining order and/or preliminary injunction, followed by a permanent injunction, enjoining the Government and employers from imposing or requiring the aforesaid mandates; and from terminating or placing on indefinite, unpaid leave any employee who does not want to take a COVID-19 vaccine or any other medical product or procedure germane to same; and order that those employees who were unlawfully terminated, forced to quit, or coerced into retirement be reinstated if they choose;

C. Defendants and employers will immediately comply with the Emergency Use Authorization Statute so that each individual has the "option to accept or refuse" administration of the COVID-19 vaccines as there is currently no FDA approved COVID-19 vaccine available to the population;

---

that the Constitution protects a person's right to "refus[e] unwanted medical care." Cruzan, 497 U.S. at 278; *King v. Rubenstein*, 825 F.3d 206, 222 (4th Cir. 2016) (recognizing same). This right is "so rooted in our history, tradition, and practice as to require special protection under the Fourteenth Amendment." *Washington v. Glucksberg*, 521 U.S. 702, 722 n.17 (1997). The Court has explained that the right to refuse medical care derives from the "well- established, traditional rights to bodily integrity and freedom from unwanted touching." *Vacco v. Quill*, 521 U.S. 793, 807 (1997). Coercing employees to receive an EUA vaccine for a virus that presents a near-zero risk of illness or death to them and which they are exceedingly unlikely to pass on to others, violates the liberty and privacy interests that the Ninth and Fourteenth Amendments. *Washington v. Harper*, 494 U.S. 210, 229 (1990) (A "forcible injection … into a nonconsenting person's body represents a substantial interference with that person's liberty[.]").

D.  That this Court adjudge, decree, and declare the rights and other legal obligations and relations within the subject matter here in controversy so that such declaration shall have the full force and effect of final judgment;

E.  That this Court grant such other and further relief as the Court deems equitable and just under the circumstances.

**COUNT II**

**Declaratory Judgment the Government and Employers Must Allow Employees the Right to Refuse a COVID-19 Vaccine and Similarly-Related EUA Products**

126.  Plaintiffs allege and incorporate by reference the foregoing allegations 1-125 as if fully set forth herein.

127. Federal law generally prohibits the introduction of any "new drug" or " biological "product," including a vaccine, without Federal Drug Administration ("FDA") approval. See 21 U.S.C. §§ 321(g), 331(a), 355(a); 42 U.S.C. §§ 262(a), 262(i)(1). In 2003, then President, George W. Bush, proposed an exception during times of emergency, suggesting a need for legislation "to quickly make available effective vaccines and treatments against agents like anthrax, botulinum toxin, Ebola, and plague." Address Before a Joint Session of the Congress on the State of the Union, 1 Pub. Papers of Pres. George W. Bush 82, 86 (Jan. 28, 2003). Among the principal legislative proposals were provisions enabling FDA to authorize medical

products for use during emergencies even prior to full FDA approval. See, e.g. , H.R. 2122, 108th Cong. § 4 (2003).

128. Congress, in 2004, created the EUA process as section 564 of the Food, Drug, and Cosmetic Act ("FDCA"). See Pub. L. No. 108-136, § 1603(a), 117 Stat. 1392, 1684 (2003) (codified at 21 U.S.C. § 360bbb-3). Section 564 authorizes the Secretary of Health and Human Services ("HHS")-who has delegated the authority to FDA- to authorize the introduction into interstate commerce drugs, devices, and biological products, including vaccines that have not yet obtained FDA approval. FDCA § 564(a)(1)-(2). Section 564 provides that the Secretary of HHS, to the extent practicable under the circumstances, "shall, for a person who carries out any activity for which the authorization is issued," establish conditions necessary or appropriate to protect the public health. Id. § 564(e)(l)(A).

129. Section 564 lists a number of conditions that the Secretary of HHS shall establish, including conditions designed to ensure that individuals receiving the EUA product are informed of certain information. Id. § 564(e)(l)(A)(ii). Most relevant here, Section 564 directs the FDA to impose conditions "designed to ensure that individuals to whom the product is administered are informed . . . of the option to accept or refuse administration of the product, of the consequences,

if any, of refusing administration of the product, and of the alternatives to the product that are available and of their benefits and risks." *Id*. § 564(e)(l )(A)(ii)(III) (emphasis added). Finally, Section 564 states that " this section only has legal effect on a person who carries out an activity for which an authorization under this section is issued."6 Id. § 564(1).

130. In light of the statutory language, the pertinent question and declaration Plaintiffs seek the Court to issue here is whether "a person who carries out an activity" under an EUA can make administration of an EUA vaccine, like the COVID-19 vaccine and other related products mandatory. The answer is no; as such mandates violate Federal law; as well as, the Constitution.

131. The statutory language is clear that the Secretary of HHS (and now FDA) must ensure that those carrying out an activity under an EUA inform those receiving an EUA vaccine of "the option to accept or refuse administration of the product." This statutory language evinces congressional intent that those carrying out an activity under an EUA refrain from making receipt of EUA products mandatory. The statutory language does not refer to "any" option, it refers to "the" option to accept or refuse, indicating that Congress intended to create and preserve "the" option to reject EUA products-rather than merely protecting an

option should those carrying out an activity under Section 564 later choose to offer one. *Duncan v. Walker*, 533 U.S. 167, 174 (2001) ("It is our duty 'to give effect, if possible, to every clause and word of a statute.' " *United States v. Menasche*, 348 U.S. 528, 538–539, 75 S.Ct. 513, 99 L.Ed. 615 (1955) (quoting *Montclair v. Ramsdell*, 107 U.S. 147, 152, 2 S.Ct. 391, 27 L.Ed. 431 (1883)); *see also Williams v. Taylor*, 529 U.S. 362, 404, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (describing this rule as a "cardinal principle of statutory construction"); *Market Co. v. Hoffman*, 101 U.S. 112, 115 (1879) ("As early as in Bacon's Abridgment, sect. 2, it was said that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'").

132. Moreover, Section 564 requires that individuals receiving an EUA product be informed of "the consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available." There is no reason for Congress to include this language if the option to refuse administration of the EUA products was illusory – Plaintiffs and employees alike must be afforded the option and ability to refuse the COVID-19 vaccine and related EUA products (emphasis added). *See Corley v. U.S.*, 556 U.S. 303, 314 (2009) ("The Government's reading is thus at odds with one of the most basic interpretive canons, that a statute should

be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant" (alterations added).

133. Thus, the Government (and employers) carrying out an activity pursuant to an EUA cannot make the acceptance or receipt of an EUA product mandatory like a COVID-19 vaccine, masks, or PCR Test; and certainly not those persons or employers who are not carrying out a statutory[58].

134. With respect to the COVID-19 vaccine itself, FDA has chosen to discharge its statutory duty to inform potential recipients of the option of accepting or rejecting the COVID-19 vaccine through facts sheets provided to both healthcare providers and recipients. Each of the FDA's fact sheets for the three COVID-19 vaccines for which FDA has granted EUA status require that providers administering those vaccines inform the recipient or their caregiver of the option to accept or refuse the vaccine. For example, FDA's Fact Sheet for Healthcare Providers Administering Vaccine for the Pfizer vaccine instructs providers that "you must communicate to the recipient or their caregiver information consistent with the 'Fact Sheet for Recipients and Caregivers'…prior to the individual

---

[58] See https://www.fda.gov/regulatory-information/search-fda-guidance-documents/emergency-use-authorization-medical-products-and-related-authorities (last visited January 20, 2022)

receiving each dose of Pfizer-BioNTech COVID-19 Vaccine, including…[t]he recipient or their caregiver has the option to accept or refuse Pfizer-BioNTech COVID-19 Vaccine." *See* fact sheets attached as **Exhibit I**.

135. All of the foregoing supports that when Congress created the EUA programs and statutes, it intended those potential recipients of EUA products like the COVID-19 vaccines would have a real, meaningful choice when it came to administration, and that those persons carrying out an activity authorized under an EUA would notify potential recipients of that choice – that Plaintiffs and employees alike have the option to refuse.

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, respectfully pray:

A.  The Court issue a temporary restraining order and enjoin Defendants and their officers, agents, employees, and attorneys, and all other persons in active concert or participation with them, from enforcing, threatening to enforce, attempting to enforce, or otherwise requiring compliance with employer or government COVID-19 Vaccine or other EUA mandates as impermissible, unlawful, and/or contrary to Federal law and the Constitution.

B.  Issues a temporary restraining order and/or preliminary injunction, followed by a permanent injunction, enjoining the Government and employers from imposing or requiring the aforesaid mandates; and from terminating or placing on indefinite, unpaid leave any employee who does not want to take a COVID-19 vaccine or any other EUA medical product or procedure germane to same; and order that those employees who were unlawfully terminated, forced to quit, or coerced into retirement be reinstated if they choose;

C.  Order and declare that Defendants and employers will immediately comply with the Emergency Use Authorization Statute so that each individual has the "option to accept or refuse" administration of the COVID-19 vaccines as there is currently no FDA approved COVID-19 vaccine available to the population;

D.  That this Court adjudge, decree, and declare the rights and other legal obligations and relations within the subject matter here in controversy so that such declaration shall have the full force and effect of final judgment;

E.  That this Court grant such other and further relief as the Court deems equitable and just under the circumstances.

Respectfully Submitted,

**<u>FERGUSON LAW, P.A</u>**.
Attorney for Plaintiffs
1 East Broward Blvd. Suite #700
Fort Lauderdale, Florida 33301
T – (954) 256 – 5646
F – (954) 256 – 5655
Service: Service@FergusonLawPA.com
E-Mail: Wayne@FergusonLawPA.com

<u>*/s/ Kenneth W. Ferguson*</u>
Kenneth W. Ferguson, Esq.
Fla Bar No.: 98950

~Psalm 23~